# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# NORTHERN DIVISION

IN RE ELIJAH AND MARY
STINY TRUSTS                                          No. 3:19-cv-346-DPM

## MEMORANDUM OPINION AND ORDER

Mary Stiny left her daughter, Rena Wood (then Powell), a 35% share of her amended survivor's trust. But there was a condition—Rena had to survive her mother. If she died before Mrs. Stiny, her 35% share would then go to her living issue by right of representation. Here are the trust's words:

> Thirty-five percent (35%) to trustor's daughter, RENA POWELL, and in the event she predeceases trustor, then to the living issue of RENA POWELL by right of representation.

Joint Exhibit 6. Mrs. Stiny died in June 2019. The current round of litigation about the Stiny trust followed. Mid-case, in January 2021, Rena was killed in a hit-and-run accident. She died without a will and left three daughters: Chatel Oldenburg Singh, Carissa Oldenburg, and Summer Oldenburg. She also left a widower, Jason Wood, the husband from whom she was apparently separated. Her untimely death created a new tangle. How should Rena's share of the trust be distributed when she survived her mother but died before receiving her share?

Chatel Oldenburg Singh and Carissa Oldenburg have asked the Court to modify the survivor's trust. They say that their grandmother, Mrs. Stiny, intended each Oldenburg daughter to receive an 8% share of the survivor's trust by way of Rena's 35% share. They argue that Rena's unexpected death, combined with this distribution-pausing litigation, frustrated Mrs. Stiny's donative intent because Rena died intestate. Christopher Beauchamp, the personal representative of Rena's estate, opposes modification. He presses that Rena's entire 35% share belongs to her estate and must be distributed according to Tennessee's law of intestate succession. Under that law, the Oldenburg daughters will inherit two thirds of their mother's estate. Jason Wood will receive the other third. TENN. CODE ANN. § 31-2-104(a)(2). This issue was tried to the bench in June 2022. The Court has considered all the evidence presented on this issue, plus benefited from the parties' briefing as well as their arguments at the trial.

Beauchamp is correct on the threshold issue. Rena's share did not lapse because she satisfied the trust's only condition precedent — she survived Mrs. Stiny. CAL. PROB. CODE § 21109(a). Her beneficial interest vested. *Burkett v. Capovilla*, 5 Cal. Rptr. 3d 817, 821 (Cal. Ct. App. 2003). And her pre-distribution passing doesn't defeat the transfer. CAL. PROB. CODE §§ 11801 & 11802(a). Rena's share will flow to her estate unless modification of Mrs. Stiny's survivor's trust is appropriate.

California law gives the Court, sitting in equity, both statutory and common law power to modify a trust's terms. *Ike v. Doolittle*, 70 Cal. Rptr. 2d 887, 907-08 (Cal. Ct. App. 1998). Under the California Probate Code, the Court may modify the trust if, "owing to circumstances not known to the settlor and not anticipated by the settlor, the continuation of the trust under its terms would defeat or substantially impair" the trust's purposes. CAL. PROB. CODE § 15409. Under the common law, the Court may modify the trust if "peculiar" or "exceptional" circumstances make modification necessary to accomplish Mrs. Stiny's purpose; and if there was some expression of Mrs. Stiny's purpose in the trust instrument. *Ike*, 70 Cal. Rptr. 2d at 907; *see also* Restatement (Second) of Trusts § 167 cmt. a (American Law Institute 1959).

All material circumstances considered, the Court concludes that modification is not warranted. First, Mrs. Stiny's intention "as expressed in the instrument controls the legal effect of the dispositions made in the instrument." CAL. PROB. CODE § 21102(a). And there is no ambiguity, patent or latent, in Mrs. Stiny's words. *In re Estate of Russell*, 444 P.2d 353, 356-63 (Cal. 1968). The Oldenburg daughters mostly agree with all this. They don't argue patent or latent ambiguity; they argue ambiguity as applied in the now-existing circumstances.

In the face of the trust's clear words, the Oldenburg daughters offered extrinsic evidence of Mrs. Stiny's intentions. The Court may

"consider extrinsic evidence regarding the circumstances under which the trust was made, in order to interpret the trust instrument, but not to give it a meaning to which it is not reasonably susceptible." *Trolan v. Trolan*, 243 Cal. Rptr. 3d 264, 272 (Cal. Ct. App. 2019). Here is the extrinsic evidence offered.

Before Mrs. Stiny became the surviving spouse, in her survivor's trust she left separate bequests to Rena and the Oldenburg daughters: 10% for Rena and 8% for each daughter (collectively, 34%). Joint Exhibit 4 at 3-4. Mrs. Stiny first amended her survivor's trust in February 2011. That amendment "reallocate[d]" the daughters' bequests to Rena and bumped Rena's share up to 35%. Joint Exhibit 5 at 1-2. Mrs. Stiny did not "eliminate" the Oldenburg daughters' interests, as she had done for a different grandchild, Corbyn Martin. *Ibid.*

These words are important. By all accounts, Mrs. Stiny intended this reallocation to function as a workaround to the generation skipping tax. Before Rena died, she testified in the *Centennial Bank* trial in December 2018: "My amount went up because the attorney suggested so that my three daughters wouldn't have to pay the second generation tax, to wrap their 8 percent, which totaled 24 percent, into mine. And then mine was 11 percent." Exhibit O-5. She also said that the original 34% got rounded up to 35% with the understanding that she would "pass that down to [her] children, each of them getting

–4–

8 percent." *Ibid.* Rena was in the room with Mrs. Stiny and Robert Smith, the lawyer who drafted the first amendment, when the amendment was executed.

Smith's deposition testimony supports this explanation. He said that, before the amendment, Mrs. Stiny had been concerned about how the generation skipping tax might affect her grandchildren. He could not recall specifics on how or when the tax issues were presented. But, based on the language that he drafted and Rena's trial testimony, he believed Mrs. Stiny would have decided to leave the Oldenburg daughters' shares to Rena so that Rena could set up a trust for them after Mrs. Stiny died. Exhibit O-6. He could not say, however, whether Mrs. Stiny's motivation "was strictly tax planning or more[.]" *Ibid.*

Two of the Oldenburg daughters also testified at the June 2022 trial. Carissa Oldenburg recalled a conversation she had with Mrs. Stiny shortly after the amendment was done. During that conversation, Mrs. Stiny told Carissa that each daughter's 8% share had been reallocated to Rena's share to give the daughters a tax benefit. Mrs. Stiny also told her that Rena would give each daughter her 8% share once the 35% share was distributed to Rena.

This tracks Chatel Oldenburg Singh's testimony. Chatel said that Rena called her while Rena was in the office with Mrs. Stiny and Smith. On that call, Rena told her that the amendment's purpose was to shield the Oldenburg daughters from the generation skipping tax. In a later

conversation, Rena told Chatel that Mrs. Stiny had been advised to put the Oldenburg daughters' 8% shares under Rena's share to lessen their tax burden.

At the trial, Beauchamp objected to admission of Mrs. Stiny's and Rena's out-of-court statements as hearsay. Those statements were offered through Rena's prior trial testimony and the two daughters' trial testimony. No party objected to the admissibility of Smith's deposition testimony. The Court overruled those objections with the caveat that it would reconsider once it had the benefit of the record. The Court has done so, and stands by its bench rulings on the layered evidentiary issues presented. Mrs. Stiny's statements come in as statements of her then-existing state of mind. Fed. R. Evid. 803(3). Rena's are admissible too, as an opposing party's statement, because her estate stands in her place and opposes the Oldenburg daughters' claim. Fed. R. Evid. 801(d)(2)(A).

The Court has considered the Oldenburg daughters' exhibits and weighed their testimony, as well as what Mrs. Stiny, Rena, and Smith said, and the record as a whole insofar as it touches this issue. But the extrinsic evidence does not supply any other reasonable meaning to Mrs. Stiny's chosen words. Rena was to get the money as an initial matter. The second step was hers to take. Again, the Oldenburg daughters don't argue latent ambiguity as to what Mrs. Stiny intended in the specific bequest she actually made to Rena. Instead, they urge

that the extrinsic evidence bears only on how Mrs. Stiny "would have wanted Rena's share to be distributed under the present circumstances." *Doc. 273 at 1-2*. The Court, however, may not use extrinsic evidence in this way. *In re Estate of Dye*, 112 Cal. Rptr. 2d 362, 370-72 (Cal. Ct. App. 2001); *Trolan*, 243 Cal. Rptr. 3d at 272-73. "A court cannot invoke [extrinsic] evidence to write a new or different instrument." *In re Estate of Dye*, 112 Cal. Rptr. 2d at 371. (alteration original and quotation omitted).

Last, the circumstances here are neither peculiar nor exceptional. Marriage, marital problems, untimely death, litigation, and intestacy are all common human experiences. It is foreseeable that a beneficiary may get married, as Rena later did to Jason Wood. It is foreseeable that a marriage might be troubled at times, as theirs seemingly was. It is also foreseeable that a beneficiary might survive a testator or settlor but die before distribution. That circumstance is familiar to California law. *E.g.*, CAL. PROB. CODE § 11801(b); *In re Taylor's Estate*, 428 P.2d 301, 302-03 (Cal. 1967). Of course, Mrs. Stiny sought to discourage trust contests and protracted litigation. *E.g.*, Joint Exhibit 6 at 2-3. Implicit in the trust's no-contest clause, though, is Mrs. Stiny's recognition that litigation might occur. Last, intestacy is all too common. Rena could have eliminated the questions presented with a will or a trust. As will likely be true for most of us, she passed away having left some important things not yet done.

The law presumes that Mrs. Stiny knew the relevant statutory and case law. *In re Estate of Dye*, 112 Cal. Rptr. 2d at 372. Whether she did or not, she had the benefit of experienced counsel when she chose how to amend her survivor's trust in February 2011. She made no change to the applicable provision when she amended her survivor's trust again in May 2013. Joint Exhibit 6. The trust as a whole embodies a clear purpose, as the Oldenburg daughters press, to benefit blood family rather than marital relatives. The clear and specific provision about Rena's share, however, applies and controls over this general intention. Mrs. Stiny could have hedged as to her Oldenburg granddaughters by requiring that Rena survive until the distribution date. She did not. Rena's daughters' claim on the trust's assets has undeniable equity, which creates hydraulic pressure in their favor. But, California and Tennessee law are clear on how Rena's share must be distributed, albeit unexpectedly, in the constellation of circumstances presented. On the record as a whole, not enough exceptional facts are presented to modify Mrs. Stiny's counseled and unambiguous directions in her chosen words.

*   *   *

Carissa Oldenburg and Chatel Oldenburg Singh's counter-petition for trust modification, *Doc. 141*, is denied. Subject to the Court's rulings on other pending issues, the trustee must distribute Rena (Powell) Wood's 35% share to her estate at final distribution.

So Ordered.

*WPMarshall Jr.*
D.P. Marshall Jr.
United States District Judge

20 March 2024