## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

**IN RE ELIJAH AND MARY
STINY TRUSTS**                                    **No. 3:19-cv-346-DPM**

## MEMORANDUM OPINION AND ORDER

**Introduction.** Disputes rooted in the trust created by Elijah G. Stiny and his last wife, Mary Moore Stiny, have been in one court or another for almost a decade. At this point, one issue remains for decision. Should the current trustee be required to provide an accounting, covering his predecessors' actions and his, from the time of Mr. Stiny's death in 2010 until the present? And should this accounting be overseen by a special master and done by a forensic accountant having no connection with the trust? Three of the seven Stiny grandchildren request that relief. These three remainder beneficiaries stand to receive most of Mr. Stiny's 50% share of the trust corpus.

The Court has resolved many other issues along the way. Three about this phase of the case bear mention at the threshold.

First, before convening a bench trial in June 2022, the Court rejected as untimely an undue-influence challenge by Elijah Nicholas Stiny, Mr. Stiny's son, to the trust's creation. *Doc. 272.* He, along with other remainder beneficiaries, received notice of trust administration

in the months following Mr. Stiny's 2010 death but did not assert undue influence in the estate plan until 2020.

Second, the Court recently denied motions to approve a proposed family settlement about Della Moore's interest. *Doc. 320.* Moore was Mrs. Stiny's mother. She predeceased Mrs. Stiny. And the Court held that the applicable trust provisions about her potential share were neither contradictory nor ambiguous. The gift to Della Moore lapsed. The shares of Mrs. Stiny's other intended beneficiaries increase proportionally, as Mrs. Stiny provided.

Third, the Court had to address what happens to Rena (Powell) Wood's share after her untimely death, mid-litigation, in a hit-and-run accident. Rena was Mrs. Stiny's daughter from a prior marriage and deeply involved in trust affairs. She died intestate. The Court received evidence and argument on this issue at the bench trial. And the Court recently rejected Rena's daughters' request to modify Mrs. Stiny's survivor's trust such that each daughter would receive an 8% share at final distribution. Rena's entire share goes to her estate. Tennessee law will govern who gets what. *Doc. 321.*

The Court held a three-day bench trial in June 2022. The parties' undecided motions and briefs seeking summary judgment were converted into trial briefs and arguments for judgment based on the whole record. The Court has weighed the credibility of all the witnesses. The Court has considered all the exhibits, joint and

separate. And the Court has drawn on what it has learned and decided in presiding over this case and earlier phases of the Stiny litigation for almost seven years. *See Centennial Bank v. Rena Wood*, Case No. 3:17-cv-226-DPM (E.D. Ark.); *In re Guardianship of Mary Moore Stiny*, Case No. 3:17-cv-227-DPM (E.D. Ark.).*

**Findings of Fact.** Elijah G. Stiny and Mary Moore Stiny had each been married before and had children from those marriages. He was much older and wealthier when they married. They lived in California. Both came from modest backgrounds. He started work as a child in coal mines in Colorado; she was part of a large family in rural Lawrence County, Arkansas. In 2000, as part of a comprehensive estate plan, they created a revocable trust. Mr. Stiny's long-time lawyer prepared the instrument. He testified by deposition that both of the Stinys knew what they were doing and wanted to sign the documents. The main trust assets were two apartment complexes in Burbank, California. Mr. Stiny had owned and maintained these income-producing assets for years. The Stinys also put in their trust their home in Burbank, a condominium in San Clemente, a home in Walnut Ridge, Arkansas, bank accounts, and unspecified personal

---

\* The Court will use the abbreviations "*Centennial Bank*" and "*In re Guardianship*" to cite materials in these cases.

property.   These additional assets were all community property. *Joint Ex. 1.*

The trust, as amended over the years, is attached in an Addendum.  Its purpose was to provide for the couple, and then the surviving spouse, eventually with sub-trusts for tax purposes. After both Stinys died, the remaining corpus would flow into one of those sub-trusts, and then be divided equally between some of Mr. Stiny's family members (the Stiny share) and some of Mrs. Stiny's family members (the Moore share).  The trust specified that California law controls.  It included a no-contest clause:  Any beneficiary who challenged the trust's creation or any of its terms would not inherit. *Art. Eleven (J)*, at *Addendum page 20*.  During their joint lifetimes, the Stinys had complete control.  Their trust was revocable.  They were co-trustees.  They were entitled to income and principal.

Over the next eight years, the Stinys amended their trust three times.  These changes were also made with the help of Mr. Stiny's long-time lawyer.  Their substance was to change who got what within the Stiny share and the Moore share.  The changes show tensions within each extended family.  For example, the share of Elijah Nicholas Stiny, Mr. Stiny's only son, was reduced from 15% of the Stiny half to a straight $25,000.  Based on an earlier family agreement, Patricia Sorley, one of Mr. Stiny's daughters, and her children continued to be excluded entirely.   On the Moore side, Rena

(Mrs. Stiny's daughter) had been excluded originally, but she eventually became a major beneficiary. John Moore, Mrs. Stiny's son, was an original beneficiary and then specifically excluded.

The Stinys lived in California. There were also tensions between Mrs. Stiny and Mr. Stiny's extended family there. In his papers contesting the trust, Mr. Stiny's son claimed that Mrs. Stiny had pushed him and his sister out of their roles helping manage the apartments and bent the aging Mr. Stiny to her will. At trial, grandson Eli Stiny testified that Mrs. Stiny limited his and other family members' access to Mr. Stiny, was not trustworthy, and was a prostitute. Mr. Stiny's daughters, Ms. Sorley and Ms. Ratzenberger, offered similar testimony by deposition. In summary, there was deep-seated and long-standing enmity between Mr. Stiny's extended family and Mrs. Stiny.

Mr. Stiny died in October 2010. His passing triggered division of the trust into sub-trusts. Three were possible, though only two were needed to maximize tax advantages. Mr. Stiny's long-time lawyer—Eric Nelson—started this process, but he and Mrs. Stiny soon fell out. He testified that she was tough and cunning. Nelson thought Mr. Stiny had been in the marriage for sex, while Mrs. Stiny was in it for the money. *Stiny Ex. 28 at 56 & 102; Doc. 186-9 at 14 & 16*. Two months after Mr. Stiny's death, Nelson withdrew from the representation. He said Mrs. Stiny was upset she was not getting

everything through the trusts, as Mr. Stiny had promised her. Nelson was concerned she would not follow his advice, and foresaw disputes between the two sides of the family, which would create a conflict of interest for him. The record contains his strongly worded withdrawal letter. *Doc. 217-4.*

Mrs. Stiny then engaged Robert Smith, a California lawyer who specialized in estate and tax issues. Smith began formal trust administration. He sent the various required notices to all the beneficiaries. Copies of the trust were provided. Grandson Eli Stiny testified that he recalled discussing with one of his aunts that he was, in her words, the big winner. None of the extended Stiny family members requested any information about the trusts from Smith. No one filed a contest. A person who identified himself as Mr. Stiny's son called and asked Smith about a picture of a sailboat. In mid-2011, a California probate court divided the trust into two sub-trusts: an exemption trust and a survivor's trust, as the original trust directed. At that point, the trust contained the assets contributed a decade before, plus a second house in Arkansas. *Joint Ex. 13.* Each sub-trust received an undivided one-half interest in each asset. *Ibid.* Smith mailed copies of the division orders to all beneficiaries; none were returned. *Doc. 186-5*; *Doc. 272 at 5-6.*

Around this time, Smith also prepared Mr. Stiny's estate tax return. It included values for all the property in the trust supported

by appraisals and listing current indebtedness.   The apartment complexes were worth approximately $15.2 million.   They were encumbered by mortgages securing about $5.2 million in debt. The family home on Vista Ridge in Burbank was worth approximately $785,000 and carried approximately $413,000 in debt. The condominium in San Clemente was worth $1 million with approximately $216,000 in debt.   The house in Walnut Ridge was worth $125,000, free and clear.   The house in Hoxie, also unencumbered, was valued at $45,000.   The two Bank of America accounts contained approximately $50,000.   There was miscellaneous personal property of approximately $56,000.   Mr. Stiny's estate tax return notes that the total gross estate was approximately $7.3 million, but this amount reflects tax-related discounts for joint ownership of the assets.   Setting aside these discounts, the return indicates that the net value of all the assets in the Stiny trust was approximately $11.5 million at Mr. Stiny's death.

The Stiny grandchildren testified that these numbers were low. They pointed to a 1989 personal ledger of Mr. Stiny's that listed several real properties, including those in the trust, related debt, and rental income.  *Stiny Ex. 11*.   That 1989 document, however, does not cast real doubt on the values in the estate tax return.   Together the documents show the property increasing in value over time. Appraisals done in connection with estate tax returns are not known

for being generous, but they must be solid. This return was based on appraisals, prepared by an experienced tax lawyer, and filed under penalty of perjury. Though the Stiny grandchildren were critical of the fact that the return was not filed until 2011, this was because of a wrinkle in changes to the Internal Revenue Code. *See* Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010, Pub. L. No. 111-312, § 301, 124 Stat. 3296, 3300. Mr. Stiny's estate tax return is reliable and persuasive evidence. The Court finds that the entire Stiny trust corpus was worth approximately $11.5 million—at most—when it came under Mrs. Stiny's control.

As the surviving spouse, Mrs. Stiny was the sole trustee and sole lifetime beneficiary of the survivor's trust. She had the unconditional right to all net income. *Art. Six (B)*, at *Add. 8*. In addition, as trustee, she had discretion to distribute principal to herself as she deemed necessary for several purposes.

> If the Trustee considers such income insufficient, the Trustee shall also pay to or apply for the benefit of the Surviving Spouse any sums from the principal of the Survivor's Trust that the Trustee, in the Trustee's discretion, considers necessary for the Surviving Spouse's proper health, support, comfort, enjoyment and welfare.

*Ibid.* She could amend, revoke, or terminate the survivor's trust. *Art. Eight (C)*, at *Add. 15*. Mrs. Stiny exercised her power of amendment twice. She never revoked or terminated the survivor's trust. Had she done so, she was entitled to all its assets outright. *Ibid.*

–8–

She also had a power of appointment, which gave her the right to dispose of the survivor's trust's assets in her will. *Art. Seven (A)*, at *Add. 9-10*. She did not exercise this power, either.

Mrs. Stiny also had the conditional right to net income and principal from the exemption trust. She was the sole trustee, and sole lifetime beneficiary, of this trust, too. These distributions were within her discretion, guided by what sums she decided were necessary to maintain her standard of living.

> On the Deceased Spouse's death, the Trustee shall pay to or apply for the benefit of the Surviving Spouse, from the net income of the Exemption Trust, all sums and in any proportion that may be necessary, in the Trustee's discretion, for his or her health, education, support and maintenance, in accordance with his or her accustomed standard of living at the date of the Deceased Spouse's death, in monthly or more frequent installments. Any income not distributed shall be added to principal.

> If the Trustee considers the income insufficient, the Trustee shall also pay to or apply for the benefit of the Surviving Spouse, all sums from principal as the trustee, in the Trustee's discretion, considers necessary for his or her proper health, education, support and maintenance.

*Art. Six (D)*, at *Add. 9*. As to any payments from principal, those were to come first from the survivor's trust until it was exhausted, and then from the exemption trust, though Mrs. Stiny could make "all or any part of those payments" from the exemption trust first "if the Trustee considers it advisable." *Ibid.* The approved spending categories—

health, education, support, and maintenance—are familiar to the law. They're rooted in the Internal Revenue Code, 26 U.S.C. §§ 2041 & 2514, and California law, CAL. PROB. CODE § 16081, both of which the Court will discuss below.

The trustee's discretion looms large in these provisions. The trust described that discretion in a later section about the trustee's powers. *Art. Ten*, at *Add. 16*. And the trust said why all these powers were granted: "To carry out the provisions of the trust created by this instrument . . .." *Ibid.* On discretion:

> Unless specifically limited, all discretions conferred upon the Trustee shall be absolute, and their exercise conclusive on all persons interested in this trust. The enumeration of certain powers of the Trustee shall not limit his general or implied powers, and the Trustee, subject always to the discharge of his fiduciary obligations, is vested with and shall have all rights, powers and privileges which an absolute owner of the same property would have.

*Art. Ten (J)*, at *Add. 17-18*.

The terms "absolute" and "conclusive" might appear to close and lock the door against the Stiny grandchildren's request for an accounting now. Under California law, though, the door is closed but not locked. Mrs. Stiny had wide and deep discretion. But, as the trust said, she had fiduciary obligations, too. This combination of discretion and obligation echoes the applicable California statute, CAL. PROB. CODE § 16081, and venerable California precedent,

*e.g.*, *In re Ferrall's Estate*, 258 P.2d 1009, 1012-13 (Cal. 1953); *Estate of Collins*, 139 Cal. Rptr. 644, 650 (Cal. Ct. App. 1977).

In the months after Mr. Stiny's passing in October 2010, as administration of the trusts began with lawyer Robert Smith's work, Mrs. Stiny also formally involved her daughter Rena in managing the trust's assets. In February 2011, Mrs. Stiny executed a "Delegation of Management Duties" pursuant to CAL. PROB. CODE §§ 16012 & 16052, which authorized Rena to work with tax and legal professionals, as well as "[e]ngage in real property management or assist with real property management including communication with property managers or management companies; reporting to the trustee relative to such management and reviewing the information provided by professional real property managers and management companies." *Doc. 172-2 at 54-55* in *Centennial Bank*. This delegation was to Rena and an Arkansas grandson, Wesley Gates, but it provided that Rena could act without consulting him. *Doc. 172-2 at 54* in *Centennial Bank*. Mrs. Stiny also executed a durable power of attorney for asset management and a uniform statutory form power of attorney. *Doc. 172-2 at 45-52* in *Centennial Bank*. The former granted Rena the power "to the extent authorized by law[]" to act on Mrs. Stiny's behalf as trustee of the Elijah and Mary Stiny Trust dated 6 June 2000. *Doc. 172-2 at 47* in *Centennial Bank*.

Mrs. Stiny took all these steps approximately four months after Mr. Stiny died.  The proof at the first trial established that, from early 2011, Rena was deeply involved with managing the two apartment complexes and handling trust assets.  The testimony and evidence likewise established that Mrs. Stiny made or approved all major decisions.

As the Court said in an earlier Order, Mrs. Stiny's handling of trust-related issues was, at best, lax.  She delegated substantial authority to others, including Rena.  There was no formal separation of the survivor's trust and the exemption trust:  all their assets were jointly owned and operated, especially the two apartment complexes and the two bank accounts.  After 2013, Mrs. Stiny and Rena relied on Linder & Associates, a property manager, to handle day-to-day matters at the apartment complexes.  Mrs. Stiny moved to Arkansas. Rena moved to Tennessee.  Rena and one of Mrs. Stiny's sisters in Arkansas, Helen Robins, had signature authority on Mrs. Stiny's Arkansas bank account.

For several years, Mrs. Stiny paid several members of her extended family here to take care of her—to cook, clean, buy groceries, run errands, drive her around, and keep her company. When three new vehicles were bought, supposedly to help handle all those chores, Rena got concerned and moved Mrs. Stiny's money out of the First National Bank of Lawrence County.  This was in late 2014

and early 2015.   And that's when litigation began in Arkansas, California, and Tennessee.   The first Arkansas matters were guardianship proceedings over Mrs. Stiny's person and her estate.

In 2015, an Arkansas court declared Mrs. Stiny incompetent based on her doctor's finding of dementia.   *Doc. 6* in *In re Guardianship*.   Robins, and then another sister, Joyce Roberts, served as guardian of her person.   *Doc. 303 at 1* in *Centennial Bank*.   She was cared for at her home.   Then she was moved to a nursing home where she lived until she passed away.   After the cases were removed here and consolidated, disputes about payment for caregiving services by some of Mrs. Stiny's extended Arkansas family arose between those family members, Rena, and Centennial Bank, the guardian of Mrs. Stiny's estate.   This Court heard testimony, received evidence, and resolved those disputes.   *Doc. 155, 167 & 209* in *Centennial Bank.*

As Mrs. Stiny's mental capacities declined, and concerns about expenditures arose, a guardian of her estate was also sought. Rena was concerned about spending by extended Arkansas family; they were concerned about her handling of Mrs. Stiny's assets.   Other family members got involved, and there was tangled litigation about who would serve as guardian of her estate.   *See In re Guardianship*, *passim*.   In early 2016, Centennial Bank was appointed temporary guardian and then permanent guardian of Mrs. Stiny's estate. The Bank retained Lyons & Cone, an established Jonesboro law firm,

to handle the matter. The firm began investigating and litigating. It did so with thoroughness and vigor.

While there were some issues about spending connected with the Arkansas caregivers, Centennial's focus was on the trust and Rena. Though cliché, "no stone unturned" captures what happened. The Bank delved into the apartments, trust spending, and handling of trust assets. Discovery was done in California, Arkansas, and Tennessee. The Bank pursued various claims against Rena, abandoning some that turned out to be empty. This was a two-year effort.

One of Centennial Bank's claims that was pursued from start to finish was removal of Rena as trustee for breach of fiduciary duty. Before the case was removed, the three Stiny grandchildren who now press claims for a comprehensive accounting and information joined in this effort. In April 2017, through a relative who was a California lawyer, they filed a joinder and consent to the Bank's petition to replace Rena. *Doc. 21* in *In re Guardianship*. This was a few months before the case was removed. Thereafter, the Stiny grandchildren chose not to participate further in the ongoing litigation in either state court or this Court.

After it became guardian of Mrs. Stiny's estate, Centennial Bank took over managing her non-trust assets and exercising indirect oversight, through the litigation, of the trust. The Bank filed annual

–14–

accountings for each year it served. There was no objection to any of those accountings. The state court and this Court approved them all. *E.g.*, *Doc. 22* in *In re Guardianship* (for 2016); *Doc. 91 & 106* in *Centennial Bank* (for 2017); *Doc. 292 & 300* in *Centennial Bank* (for 2018); *Doc. 308-1, 309, 318 & 321* in *Centennial Bank* (for 2019). The trust's 2014, 2015, 2016, and 2017 federal and state tax returns were prepared by an outside certified public accountant. Mrs. Stiny's federal and state tax returns for the same years were amended by another certified public accountant. *Doc. 125, 129 & 131* in *Centennial Bank*. When Mrs. Stiny died, her non-trust assets were transferred to her probate estate with this Court's approval. *Joint Ex. 14*.

From the time the cases were removed here and consolidated in August 2017, this Court oversaw all trust assets and expenditures of trust funds. These included, among other things, expenses connected with refinancing debt on the apartment complexes, tax payments, income from the apartments, attorney's fees, the sale of both Arkansas homes, the sale of Mrs. Stiny's vehicle, and payment of her living, medical, and funeral expenses. Because Rena's status was under challenge, the Court brought much of the cash—more than $700,000— into its registry. In due course, the Court provided the parties a ledger showing all receipts and disbursements. *Doc. 106*. In addition, this Court mandated pre-approval of all expenditures from the trust's remaining bank accounts. *E.g.*, *Doc. 51* in *Centennial Bank*. No trust

money was spent, and no significant trust-related action was done, after August 2017 without this Court's approval.

The case culminated in a week-long combined jury and bench trial.   Centennial Bank contended that Rena had mishandled trust assets, spent money on herself, mismanaged the apartments (in particular by letting some of her children live there rent-free or for reduced rent), and failed to spend money on Mrs. Stiny.   The Bank continued to seek Rena's removal as trustee.   At trial, this Court received fifty-six exhibits and extended testimony from five witnesses.   Thousands of pages of documents—trust materials, bank records, apartment-related records, and other papers—were presented.

The Court put the legal issues to the jury in a single question. "Did Rena Wood, in violation of her fiduciary duties, convert income from the survivor's trust that should have been paid to, or applied for the benefit of, Mrs. Stiny?"   *Doc. 271* in *Centennial Bank*.   The question spoke in terms of the survivor's trust because the record established that—again, the laxness point—the exemption trust existed in name, but Mrs. Stiny and Rena handled everything as one.   The jury answered "No."   This Court then handled the equitable issues, concluding that Rena should not be removed as the trustee but needed a co-trustee to help handle the complex issues presented by administration of this big-dollar trust.   *Doc. 295 & Doc. 338 at 179-185* in *Centennial Bank*.

In the summer of 2019, after receiving the parties' nominees, this Court appointed G.S. "Brant" Perkins as co-trustee of the survivor's trust. *Doc. 309* in *Centennial Bank*. Any action required agreement between Rena and Perkins. No expenditure more than $25,000 could be made without prior Court authorization. And Perkins had to file a bond, as the trust required. In due course, the Court appointed him and Rena as co-trustees of the exemption trust on the same terms. After Rena's untimely death, and without objection, the Court confirmed Perkins's status as sole trustee of both trusts. *Doc. 92*.

Perkins has served faithfully and well for almost five years. During that time, he has filed seventeen comprehensive status reports. *Doc. 322* in *Centennial Bank*; *Doc. 2, 6, 56, 78, 85, 119, 159, 175, 185, 206, 279, 288, 306, 308 & 322*. When Rena was co-trustee, these reports were from her and Perkins. Each report was detailed, covering actions taken since the last report. Attachments were plentiful. These included bank statements, monthly management reports from Linder & Associates about the apartment complexes, tax returns, billing statements from lawyers, and itemized statements from Perkins describing his work as trustee on a task/hourly basis. When any supplement was needed, he provided it. *E.g., Doc. 289*. With two exceptions, *Doc. 207 & 297*, the Stiny grandchildren did not object to these status reports. No one else objected to any of them or any of the co-trustees' (and eventually trustee's) actions.

–17–

The seventeenth report is pending.  The Court has approved all the other status reports and the actions specified in them.

On large matters—for example, selling the apartment complexes, paying income taxes, investment plans, and selling other property (real and personal)—the trustee filed separate motions with supporting documents.  Sometimes the Stiny grandchildren disagreed with the trustee's proposal.  In those instances, the Court ruled after briefing and (if needed) a hearing.  *E.g.*, *Doc. 73* (sale of apartment complexes).  A dispute about the proposed sale of personal property was resolved by the Stiny grandchildren's purchase of it.

By December 2019, the case was entering a new phase. The Centennial Bank/Wood litigation had been resolved, and no appeal was taken.  Mrs. Stiny had passed away.  Perkins and Rena were in place as co-trustees of both the survivor's and exemption trusts.  To conform the docket to the developing circumstances, the Court closed Case No. 3:17-cv-226-DPM and Case No. 3:17-cv-227-DPM and opened this case to address trust administration and distribution of the trust's assets.  The Court noted that key Orders in the two original cases would be landmarks in this one.  *Doc. 1.*

The co-trustees continued to work.  They handled tax issues. They petitioned the Court to construe and declare the trust's terms so distribution could occur.  *Doc. 9.*  They served that petition and summonses on all the remainder beneficiaries.   And they began

exploring sale of the apartment complexes to liquidate the trust's main assets in anticipation of distribution among those many beneficiaries. The Court had directed this needed step. *Doc. 7.* The co-trustees eventually petitioned to approve the sale of the apartments for more than thirty-one million dollars, an amount exceeding the apartments' 2019 appraised value by several million dollars. *Doc. 58 at 3-4.*

The three Stiny grandchildren—Eli, Andrew, and Alexis—re-entered the case at this point. They sought an accounting since Mr. Stiny's death in 2010 and information. *Doc. 66.* Alone among the beneficiaries, they also opposed the apartments' sale. They sought more time to present an offer to buy the two apartment complexes themselves, thus keeping them in the family as they said Mr. Stiny wanted. *Doc. 67.* The Court held a hearing, overruled that objection, went with the firm and beneficial offer in hand, and approved the sale. *Doc. 68, 72, & 73.* It was consummated. The trust netted approximately twenty-six million dollars. *Doc. 85 at* 6.

In due course, the Court convened a status conference to develop a plan for moving the case to resolution. In light of all that had gone before, to expedite discovery, and with the parties' agreement in principle, the Court ordered these steps.

- A period of informal discovery with wholesale sharing of all non-privileged materials;

- The trustee would have transcripts of all hearings (federal and state) and the trial prepared at the trust's expense and filed;

- Rena's former lawyers would open their files (electronic and paper) and provide copies. These materials included all trial exhibits, deposition transcripts, and non-privileged case-related documents;

- The trustee would secure and provide a similar comprehensive set of materials from Centennial Bank's lawyers; and

- Formal clean-up discovery.

*Doc. 95*.

All this was done. The Centennial Bank records amounted to more than forty banker's boxes of paper material. *Doc. 119 at 2*. In addition, Rena's estate made available more than a decade's worth of records, sixty-plus banker's boxes. *Doc. 119 at 2-3*. It was at this point that the Court prepared and filed its ledger of all registry transactions. *Doc. 106*. The Stiny grandchildren have made no complaint about the scope, contents, or timeliness of these productions. The parties also agreed that a post-discovery global mediation might narrow or resolve the disputed issues. The Court ordered one. *Doc. 95 at 2*. It did not bear fruit, though. After approximately fifteen months, during which many trust administration issues were addressed, some more discovery was done, and some motion practice occurred, the Court held another

bench trial.    In the twenty-two months since, the flow of trust-administration issues has continued unabated.  *See Doc. 270 to 331*.

**Conclusions of Law.**    The three Stiny grandchildren seek a comprehensive accounting, overseen by a special master, and performed by a third-party forensic accountant.  The accounting, they continue, should cover the exemption trust from 2010 (when Mr. Stiny died) to the present and cover the survivor's trust from the date of Mrs. Stiny's incapacity (2015) until the present.

The third count of their counter-petition challenged some of Rena's actions as co-trustee after the *Centennial Bank* litigation.  But the parties resolved their differences about the personal property, and this issue has dropped out.  *Doc. 166*.  On motion, the Court approved this resolution.  *Doc. 170*.  No proof was presented at trial on this claim.

As noted, Mrs. Stiny and Rena handled the two trusts as one. So, as they acknowledged at trial, the Stiny grandchildren actually seek an accounting of the whole from the time Mr. Stiny was no longer in the picture.  The trustee opposes this request, arguing that the Stiny grandchildren are not entitled to this from-the-start accounting in general or from him as a successor trustee in particular. He also contends that the Court should not exercise its discretion to order such an accounting because no sufficient reason to do it exists, the task would be complex, plenty of information has already been provided, and it would further delay final distribution.  Rena's estate

seconds the trustee's points.  No other trust beneficiary has joined in the three Stiny grandchildren's request or otherwise indicated support of it.

*First*, the Stiny grandchildren are not entitled as a matter of law to the comprehensive accounting they seek.  Under California law, a trustee must account at least annually, at a trust's termination, and upon a change of trustee "to each beneficiary to whom income or principal is required or authorized in the trustee's discretion to be currently distributed."  CAL. PROB. CODE § 16062(a).  The Stiny grandchildren were not entitled to receive income or principal from the trust at Mr. Stiny's death.  They were not entitled to receive income or principal at Mrs. Stiny's incapacity.  After Mr. Stiny died, Mrs. Stiny was the sole income and principal beneficiary of both the exemption trust and survivor's trust for her lifetime.  *Art. Six (B) & (C)*, at *Add. 8-9*.  The Stiny grandchildren acknowledge this fact. *Doc. 226 at 3*.  It was only at Mrs. Stiny's death—in June 2019—that the Stiny grandchildren and all the other remainder beneficiaries became entitled to at least annual accountings from Perkins and Rena, who was still alive at that point.   From that point forward, those accountings only needed to cover the period during "the last complete fiscal year of the trust or since the last account."  CAL. PROB. CODE § 16063(a)(1), (3) & (4);  *see also* § 16063(a)(2).

*Second*, Perkins and Rena satisfied their statutory obligation to account before and since Mrs. Stiny's death with their seventeen status reports.  CAL. PROB. CODE § 16063.  Those reports covered receipts and disbursements of principal and income, assets and liabilities, trustee compensation, taxes, and agents hired by the trustee.  The reports covered many other details, too.  And all of this information was rooted in attached documents.

The Stiny grandchildren correctly point out that the reports did not contain a statement that any recipient could obtain court review of the account and trustees' actions.  CAL. PROB. CODE § 16063(a)(5).  But everyone involved in the case knew that this Court was reviewing the reports.   And this Court approved each of them after having done so—twice after ruling on the Stiny grandchildren's objections. *Doc. 220 & 307*.

The status reports also omitted a statement about the three-year statute of limitation for claims against the trustee for breach of trust.  CAL. PROB. CODE § 16063(a)(6).  That omission wasn't prejudicial either.   Since June 2020, the Stiny grandchildren have been well represented by able counsel who have zealously represented their clients, advancing objections and voicing their views and positions. The status reports were sufficient to put the Stiny grandchildren and their lawyers on notice of any claims against the trustee for breach of trust.  CAL. PROB. CODE § 16460(c);   *Noggle v. Bank of America*,

82 Cal. Rptr. 2d 829, 859-60 (Cal. Ct. App. 1999).  And anyway, except for the pending seventeenth status report, it is now too late to press these form-over-substance challenges.  *Coberly v. Superior Court for Los Angeles County*, 42 Cal. Rptr. 64, 66 (Cal. Dist. Ct. App. 1965). Perkins has satisfied his statutory obligations to account as a successor co-trustee and successor trustee.  Rena satisfied her obligations here, too.

*Third*, the Stiny grandchildren are correct that Perkins, like all trustees, has a duty to keep beneficiaries "reasonably informed of the trust and its administration."  CAL. PROB. CODE § 16060.  This duty is broader than the duty to account.  *Babbitt v. Superior Court*, 201 Cal. Rptr. 3d 353, 360 (Cal. Ct. App. 2016).  Perkins, and Rena while she was co-trustee, fulfilled this duty.  They did so in their many status reports.  They did so in sharing all the Centennial Bank/Wood litigation documents—trial transcripts, trial exhibits, depositions, bank reports, and other voluminous materials. Perkins confirmed that he made available everything in his control and coordinated with the lawyers in the Centennial Bank/Wood litigation (Jim Lyons and Marty Lilly) to open their files to the Stiny grandchildren's lawyers.  Counsel for Rena's estate confirmed that a storage unit full of Rena's records was also made available. In addition, this is not the typical trust dispute.  Materials on this Court's docket in the three cases have been open to the public in

general and to the Stiny grandchildren in particular since 2017. The Court also credits Perkins's trial testimony on this score:  when any beneficiary requested information, he provided it if he had it. Nothing has been held back or hidden.

A related point bears mention.  As the commentary to § 16060 notes, in general, a trustee's duty to provide information requires an ask.  *See also* RESTATEMENT (SECOND) OF TRUSTS § 173 cmt. d (AM. L. INST. 1959).  "This duty is consistent with the duty stated in prior California case law to give beneficiaries complete and accurate information relative to the administration of a trust *when requested at reasonable times*."  *Salter v. Lerner*, 99 Cal. Rptr. 3d 1, 3 (Cal. Ct. App. 2009) (quotation omitted and emphasis added).  There was no evidence that, in the years after Mr. Stiny's death in 2010, the Stiny grandchildren ever asked Mrs. Stiny or Rena for information or that any such request was refused.  Grandson Andrew Stiny's trial testimony corroborates this.  And even though the Stiny grandchildren joined in Centennial Bank's 2017 petition to remove Rena as trustee and to appoint Perkins in her place, they did not, insofar as the Court knows, seek any information from Rena or Perkins until they filed their petition in the summer of 2020.

If the Stiny grandchildren's silence and chosen inaction through the years does not amount to a full-fledged waiver, it suffices to work a forfeiture.  *E.g.*, *Breslin v. Breslin*, 276 Cal. Rptr. 3d 913, 919

(Cal. Ct. App. 2021) (forfeiture);   *compare In re Kirkpatrick's Estate*, 241 P.2d 555, 558 (Cal. Dist. Ct. App. 1952) (waiver).  By not seeking information at reasonable and seasonable times, they have forgone the right to get perfect information now about trust-related transactions that occurred before the litigation began a decade ago. This conclusion follows especially because the folks with first-hand knowledge—Mrs. Stiny and Rena—have passed away.  The Stiny grandchildren are entitled to information reasonably available now, not more.  And all that voluminous material has been provided to them.

*Fourth*, the Stiny grandchildren are correct that, even if they're not entitled to an accounting as of right, the Court can order one if the circumstances justify that relief.  CAL. PROB. CODE §§ 16061 & 17200(b)(7)(B);  *Esslinger v. Cummins*, 50 Cal. Rptr. 3d 538, 543-44 (Cal. Ct. App. 2006);  *Babbitt*, 201 Cal. Rptr. 3d at 357.  All material things considered, should the Court exercise its discretion and order the requested accounting back to 2010?  No.  Here is how the Court weighs the circumstances.

As to the survivor's trust, Perkins argues that no trustee should have to account during the period it was revocable.  That period would run from 2011, when it was funded, until 2015, when Mrs. Stiny was declared incompetent.  The applicable California statute so provides.  CAL. PROB. CODE § 16069.  And the precedent so holds.

–26–

*Babbitt*, 201 Cal. Rptr. 3d at 360-61; *Evangelho v. Presoto*, 79 Cal. Rptr. 2d 146, 151 (Cal. Ct. App. 1998). It is undisputed here, though, that the survivor's trust and the exemption trust were not managed separately. Everything was handled together. This made some sense because each trust held an undivided one-half interest in the main income-producing properties, the two apartment complexes. The exemption trust became irrevocable when it was created after Mr. Stiny's death. *Art. 8 (C)*, at *Add. 15*. The revocability of the survivor's trust weighs against an accounting. Given how the trust corpus was handled, however, this statute and precedent do not determine whether there should be one.

The long arc of litigation, though, shows why no accounting is justified. Start with the recent years. Every trust-related action, every dollar earned and every dollar spent, has been under this Court's oversight since the case arrived here in August 2017. And all these things are documented on this Court's docket. Centennial Bank had been appointed guardian of Mrs. Stiny's estate in February 2016. It accounted for assets, liabilities, income, and expenses from that point until this Court ended the guardianship after Mrs. Stiny's death. No useful purpose would be served by a forensic accounting of the trust when it was under the eye of the state court and this Court.

The next relevant period is from early 2011 to 2016. That is the period from the time trust administration began, a few months after

Mr. Stiny's death, until Centennial Bank came on the scene.  For the first part of that period, Mrs. Stiny and Rena handled all trust-related matters without oversight;  then Centennial Bank entered the state litigation as guardian of Mrs. Stiny's estate.  Through the first trial, which was in December 2019, the Bank faithfully discharged its fiduciary duties with birddog investigation and bulldog litigation, mostly against Rena.  What seemed to this Court to have been every instance of allegedly improper conduct by Rena from 2011 on was explored by Centennial Bank.  The issues where facts were murky or motivations debatable were tried.  The jury and the Court ruled for Rena.  *Doc. 295* in *Centennial Bank*.

This Court's 2019 judgment precludes the Stiny grandchildren's attempt, by way of accounting, to litigate Rena's many trust-related activities now.  It has already been done.  One of the main reasons the Stiny grandchildren advance for doing a comprehensive accounting, for example, is mismanagement of the apartments.  In particular, they point to some of Rena's children living there for free or reduced rent in return for doing some on-site management chores.  But this precise dispute was presented in detail to the jury and the Court in service of Centennial Bank's failed conversion and breach-of-fiduciary claims as guardian of Mrs. Stiny's estate.  The Stiny grandchildren also instance Rena's prior felony drug conviction.  This fact, too, was emphasized at

the first trial.  Neither fact-finder was persuaded that this part of Rena's past made any difference on trust-related issues.

The law of the forum, Arkansas, provides the rule of decision on preclusion issues.  *Semtek International Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001); *In re Bair Hugger Forced Air Warming Devices Products Liability Litigation*, 999 F.3d 534, 537-38 (8th Cir. 2021). The record establishes each element of claim preclusion.

- This Court had jurisdiction, which is undisputed;
- Privity existed.  Mrs. Stiny and the Stiny grandchildren were trust beneficiaries with aligned interests. As guardian of her estate, Centennial Bank pursued those interests;
- The same issues were, or could have been, litigated— Rena's alleged mishandling of trust assets;
- A full and fair opportunity to litigate, illustrated by the two years of vigorous litigation, which is undisputed; and
- A final judgment on the merits, which is also undisputed.

*Scott v. City of Sherwood*, 94 F.4th 778, 780 (8th Cir. 2024) (Arkansas law).  The Stiny grandchildren argue that they weren't in privity with the Bank and that their claim is different.  *Doc. 275 at 5*. Their arguments are unpersuasive.

The Stiny grandchildren are Centennial Bank's privies because their interests aligned with Mrs. Stiny's—they were all trust

beneficiaries. The Bank, as guardian of Mrs. Stiny's estate, acted to protect Mrs. Stiny's beneficial interests. It petitioned to remove Rena as trustee and to replace her with Perkins. *Doc. 18* in *In re Guardianship*. The Stiny grandchildren filed a "Joinder and Consent" to that petition. They said:

> The Stiny Family Beneficiaries are informed and believe that the failure to remove Rena Wood[] as trustee of the Stiny Trust would harm Mary Moore Stiny for the remainder of her life, and it would significantly diminish the available assets that should be distributed to the Stiny Family Beneficiaries under the Stiny Trust and the express requests of Elijah Stiny (deceased) and Mary Moore Stiny, due to Rena [Wood's] illegal and fraudulent handling of the Stiny Trust funds.

*Doc. 21 at ¶ 6* in *In re Guardianship*. The Stiny grandchildren understood that what was good for Mrs. Stiny was good for them. Their consent to and joinder in Centennial Bank's efforts made clear that the Bank was "so identified in interest with [the Stiny grandchildren] that [it] represent[ed] the same legal right." *Francis v. Francis*, 343 Ark. 104, 111-13, 31 S.W.3d 841, 845-46 (2000) (quotation omitted).

The Stiny grandchildren also try to cabin the Judgment's reach, pointing out that Centennial Bank made no claim for an accounting in its second amended complaint, *Doc. 37* in *Centennial Bank*. They're correct about what specific claims were made in that complaint,

but incorrect about the legal effect of that fact and exactly what happened in the case.

It is immaterial whether the prior litigation involved identical claims or causes of action. *Deer/Mt. Judea School District v. Kimbrell*, 2013 Ark. 393, at 11-12, 430 S.W.3d 29, 39. That's because the Stiny grandchildren's claim for an accounting for this period is rooted in the same factual soil as Centennial Bank's claims for breach of fiduciary duty, conversion, and removal. This discretionary remedy was available in the prior litigation. And under Arkansas law, "res judicata will apply even if the subsequent lawsuit raises new legal issues and seeks additional remedies." *Ibid.*

In any event, and going back to the joined and consented-to petition, the Bank did seek an accounting. It asked that Rena fully account for all property, income, costs, and attorney's fees for all Stiny trusts or sub-trusts. *Doc. 18 at 9* in *In re Guardianship*. This Court denied that part of the Bank's petition without prejudice in September 2017. *Doc. 27 at 2* in *Centennial Bank*. In early 2018, Centennial Bank renewed its request; it again sought an accounting of all trust assets. *Doc. 57 at 2* (motion) *& Doc. 326 at 4* (oral argument) in *Centennial Bank*. This Court held a hearing, and instead directed Rena to provide all trust-related bank records and the trust's tax returns. *Doc. 326 at 59-62* (bench ruling) *& Doc. 79* (Order) in *Centennial Bank*. She did. *E.g., Doc. 89, 99, 131 & 151* in *Centennial Bank*. Full disclosure

of all records to the Bank's experienced lawyers, so they could evaluate all trust activities, was a more effective way of getting at the truth than ordering Rena to prepare an accounting. Thereafter, having received full information, the Bank didn't press the accounting issue further. Any potential claim that the Stiny grandchildren had for an accounting about Rena's trust-related actions before the first trial merged into this Court's prior Judgment. *Coleman's Service Center, Inc. v. F.D.I.C.*, 55 Ark. App. 275, 293, 935 S.W.2d 289, 299 (1996).

Whatever the preclusive effect of the prior Judgment, the deeper point remains. Mrs. Stiny involved Rena in handling the trust four months after Mr. Stiny died. The trustee argues that the Stiny grandchildren want an investigation, rather than an accounting, of how Rena and Mrs. Stiny handled everything. The Stiny grandchildren's request for a special master and an outside forensic accountant illustrates the comprehensiveness of their request. In truth, they seek a *second* investigation. Centennial Bank and its lawyers provided outsider scrutiny. Considering all the material circumstances, and exercising the discretion conferred by California law on this point, this Court holds that, apart from any preclusion bar, no useful purpose would be served by another investigation of Rena's trust-related activities between 2011 and 2016-2017, when the Bank took over and then this Court's oversight began. *Esslinger*, 50 Cal.

Rptr. 3d at 543-44.  Any such effort would only further delay final distribution to the detriment of the trust's beneficiaries with only conjectural benefit.

The Stiny grandchildren emphasize that they're skeptical about Mrs. Stiny's actions, as well as Rena's, and perhaps even more so. A large part of Rena's defense was that Mrs. Stiny had approved or authorized many challenged actions.  The Stiny grandchildren are correct here.  The earlier Judgment weighs in the balance but doesn't preclude their effort to call Mrs. Stiny to account.  That issue turns, instead, on the trust's terms and the facts.

The words that Mr. and Mrs. Stiny chose to capture their intentions gave Mrs. Stiny the broadest discretion that California law allowed.  *Compare Art. Ten (J)*, at *Add. 17-18*, *with* CAL. PROB. CODE § 16081, *and Tubbs v. Berkowitz*, 260 Cal. Rptr. 3d 852, 857-59 (Cal. Ct. App. 2020).  Mrs. Stiny could not act arbitrarily or unreasonably, but the law presumes that she acted in good faith.  *In re Ferrall's Estate*, 258 P.2d at 1015;  *Estate of Nicholas*, 223 Cal. Rptr. 410, 418 (Cal. Ct. App. 1986).  To overcome that presumption, the Stiny grandchildren would have "to show a bad faith exercise of absolute powers." *Estate of Nicholas*, 223 Cal. Rptr. at 418.  They have not done so; nor have they shown a reasonable probability that they could do so. The Court recognizes that the Stiny grandchildren aren't yet pressing a claim that Mrs. Stiny violated her fiduciary duty.  But they have not

made a sufficient preliminary showing of unreasonable or arbitrary decisions. Instead, the record as a whole undermines their discretionary request for an accounting of Mrs. Stiny's actions between 2011 and 2016, when the Bank became guardian of her estate.

Even though the Stiny grandchildren have had unfettered access to this Court's voluminous dockets (which include many of the state court papers), and approximately one hundred banker's boxes full of trust-related documents (including records from the trust's two long-standing bank accounts), they have pointed to no instance where it appears that Mrs. Stiny may have acted in bad faith. They question, for example, where the approximately $650,000 in proceeds from the 2011 sale of the San Clemente condo went. But the closing statement from that transaction reflects that they were paid to the trust. *Stiny Ex. 6.* Absent some evidence to the contrary, the most reasonable inference is that those proceeds went into the trust pot.

Instead, the Stiny grandchildren impugn Mrs. Stiny's character. But, again, no proof was offered of her throwing money out the window, making substantial gifts to non-family members, or making otherwise unreasoned decisions. In addition, there was no evidence that she was squirrelling away assets. Administration of her probate estate in state court is mostly done. After all obligations have been satisfied, and the expenses of administration paid, her probate estate contains approximately $4,000 today. *Doc. 322 at 1-2.*

Consider the bottom line.  Mrs. Stiny lived, spent, and left the trust in better shape than she found it.  The current trust corpus available for distribution is approximately twenty-four million dollars. *Doc. 322 at 3-6.*  That number is net of the millions of dollars paid during the last seven years for taxes (federal and state), professional fees (CPAs, lawyers, real estate commissions), debt, and other expenses of trust administration.  Recall that approximately eleven-and-a-half million dollars of trust assets came into Mrs. Stiny's hands at her husband's death.  The available trust corpus has more than doubled in the intervening fourteen years.  The Stiny grandchildren discount this fact, saying it just reflects an inflation-driven increase in the apartment complexes' value.  Of course the property values increased over time.  But that is only part of the story.  These assets were managed, maintained, improved, plus debts were repaid.  The trust also supported Mrs. Stiny in her accustomed lifestyle.  And there was no evidence that she lived lavishly, which brings the Court back to the trust's terms.

As to the survivor's trust, Mrs. Stiny could spend all the income for any purpose she chose and all the principal for her proper health, support, comfort, enjoyment, and welfare.  *Art. Six (B)*, at *Add. 8*.  Those categories spring from the Internal Revenue Code.  *See* CAL. PROB. CODE 16081(c);  26 U.S.C. §§ 2041 & 2514.  They cover many things and are "not limited to the bare necessities of life."

26 C.F.R. § 20.2041-1.  California law broadly construes them, too. Examples include, but are not limited to:  housing, feeding, clothing, recreation, vacation, travel expenses, proper care, nursing, medical expenses, mortgage payments, life insurance, attorneys fees, community debts, and provisions for future debts.  *In re Marriage of Benjamins*, 31 Cal. Rptr. 2d 313, 315-17 (Cal. Ct. App. 1994). Black's Law Dictionary echoes these categories and includes in its definition of support "the courtesies and kindness usually obtaining between individuals that have the same ties of blood[,]" and "[o]ne or more monetary payments to a current or former family member for the purpose of helping the recipient maintain an acceptable standard of living."   *Support*, BLACK'S LAW DICTIONARY (11th ed. 2019). And, according to the Stinys' trust, these enumerated powers "shall not limit [Mrs. Stiny's] general or implied powers . . .."  *Art. Ten (J)*, at *Add. 18*;   *see also Estate of Friedman*, 156 Cal. Rptr. 597, 598-99 (Cal. Ct. App. 1979).

Mrs. Stiny could also spend income, and principle, if necessary, from the exemption trust, to maintain her standard of living. *Art. Six (D)*, at *Add. 9*.  As the trustee points out, the trust's structure allowed Mrs. Stiny to spend the survivor's trust down to zero (or even revoke it), then live out of the exemption trust, with any remaining balance being split fifty-fifty between the Moore share and the Stiny share.  *Art. Six (B) & (D)*, at *Add. 8-9*;  *Art. Seven (D)*, at *Add. 10*;

*Art. Eight (C)*, at *Add. 15*.  Mrs. Stiny lived as she chose, but she didn't loot the two sub-trusts.

The trust also gave Mrs. Stiny a power of appointment over the assets in the survivor's trust.  *Art. Seven (A)*, at *Add. 9-10*.  She could have used that power and disposed of all those assets through her will to any beneficiary she chose.  *Ibid.*  Because all the Stiny trust assets were jointly held, this maneuver would have cut in half the corpus available for the 50/50 family distribution.  Mrs. Stiny, however, did not exercise her power of appointment.  This decision shows her fidelity to the distribution originally planned by Mr. Stiny and her: an eventual 50/50 split between the families.

The Stiny grandchildren ask for the accounting and information now, but they seek more.  They candidly acknowledge that, assuming any misstep or questionable action by Mrs. Stiny, they intend to seek a reapportionment—deductions from the Moore share, as a true-up. *Doc. 275 at 8*.  The Court declines to endorse this plan because Mr. and Mrs. Stiny's trust forbids it in no uncertain terms.

> In the event any beneficiary under this trust shall . . . contest in any court the validity of this trust . . . or shall seek to obtain an adjudication in any proceeding in any court that this trust or any of its provisions . . . is void, or seek otherwise to void, nullify, or set aside this trust or any of its provisions, then the right of that person to take any interest given to him by this trust shall be determined as it would have been determined had the person predeceased

the execution of this Declaration of Trust without surviving
issue.

*Art. Eleven (J)*, at *Add. 20*.   The Stiny grandchildren's plan would
attack the trust's provisions on two fronts.

First, it would challenge Mrs. Stiny's discretion and authority to
manage the two sub-trusts for *her* benefit, as the sole lifetime income
and principal beneficiary.   *See Dae v. Traver*, 284 Cal. Rptr. 3d 495,
504 (Cal. Ct. App. 2021).   Bare allegations that a trustee violated her
fiduciary duty do not entitle beneficiaries to challenge that conduct
"without risking forfeiture under the no contest clause."   *Hearst v.
Ganzi*, 52 Cal. Rptr. 3d 473, 483 (Cal. Ct. App. 2006).

Second, any reapportionment would challenge Mr. and Mrs.
Stiny's unambiguous distribution scheme.   No-contest clauses
"promote the public policies of honoring the intent of the donor and
discouraging litigation by persons whose expectations are frustrated
by the donative scheme of the instrument."   *Donkin v. Donkin*,
314 P.3d 780, 787 (Cal. 2013).   The Stiny grandchildren's proposed
reapportionment in the final distribution would be, in effect, a
challenge to the trust itself.   *Doc. 275 at 8*;   *Schwartz v. Schwartz*,
84 Cal. Rptr. 3d 387, 397 (Cal. Ct. App. 2008).

The Stiny grandchildren say they're not challenging the trust.
*Doc. 66 at 6*.   The Court does not hold that they are.   But, having heard
their testimony and studied their many papers, it is clear that the

Stiny grandchildren seek this from-the-start accounting to mount what would quickly become a challenge to the Stiny trust's core: plenary discretion and entitlement during Mrs. Stiny's lifetime; and a 50/50 distribution between the Stiny and Moore families after her passing. Based on the record as a whole, the Court will not exercise its discretion in service of that end.

The Court understands. The Stiny family (or at least those who've testified) view Mrs. Stiny as an interloper who benefitted unfairly from Mr. Stiny's wealth and whose extended family now stands to benefit. Those were the terms, though, of Mr. and Mrs. Stiny's estate plan. They created this plan with the help of his long-time lawyer, who was unequivocal that Mr. and Mrs. Stiny's trust terms were exactly what they wanted.

All material things considered, and exercising its discretion under California law, the Court declines to order the current trustee to provide the Stiny grandchildren more information or to facilitate a comprehensive forensic accounting prepared by a third party and overseen by a special master. A superabundance of information has been provided. This Court has overseen the trust since 2017, for almost seven years. Nothing material has happened in the trust without Court approval during that period. As guardian of Mrs. Stiny's estate, Centennial Bank thoroughly investigated and faithfully pursued potential claims arising out of the 2011 to 2017 period,

especially against Rena.  A jury and this Court found for Rena, and she was not removed as a trustee.  As to Mrs. Stiny, nothing offered by the Stiny grandchildren, or otherwise known to the Court, triggers any obligation under California law by Perkins to further investigate or account for his predecessor trustees' actions.  CAL. PROB. CODE § 16403.  And the Court declines to order an accounting of Mrs. Stiny's discretionary spending of trust income and principle.  No preliminary showing of bad faith has been made.  Looseness there was.  Generosity to family members, too.  But there is insufficient evidence of arbitrary or unreasoned actions to justify an expensive, time-consuming, and distribution-delaying effort to puzzle out every last detail.  Mr. and Mrs. Stiny's clear intentions, as modified by the applicable statutory law and precedent, were that the trustee's discretions were broad and the trustee's decisions well-nigh final.  No sufficient reason exists to keep investigating in an effort to upset Mr. and Mrs. Stinys' chosen disposition of their estate.

\*     \*     \*

1.     The parties' motions for summary judgment, *Doc. 212, 215 & 217*, which the Court did not have time to rule on before the bench trial, are denied without prejudice as mooted by the trial.  The Court has considered the arguments and authorities in all those papers in support of the parties' various petitions.

**2.**    The Elijah and Mary Stiny Trust, as amended, *see* Addendum, is valid.

**3.**    The trustee's amended petition to construe the trust, *Doc. 9*, is granted as modified as specified in this Order, the Order on Della Moore's share, *Doc. 320*, and the Order on Rena (Powell) Wood's share, *Doc. 321*.

**4.**    The Stiny grandchildren's counter-petition, *Doc. 66*, is denied.

**5.**    The Court directs the trustee to prepare and file a proposed final distribution plan by 31 May 2024.   Any beneficiary who has suggestions about the architecture of that plan must submit them to the trustee by 10 May 2024.

So Ordered.

*W.D. Marshall Jr.*

D.P. Marshall Jr.
United States District Judge

*12 April 2024*